795 F.2d 628
 Ronald J. NEMMERS and Sarah L. Nemmers, parents and next
friends of Eric P. Nemmers,
Plaintiffs-Appellants--Cross-Appellees,
v.
UNITED STATES of America, Defendant-Appellee--Cross-Appellant.
 Nos. 85-2360, 85-2486.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 2, 1986.
Decided July 11, 1986.
 
 Edward R. Durree, Strodel, Kingery & Durree, Assoc., Peoria, Ill., for plaintiffs-appellants--cross-appellees.
 Mark D. Stuaan, Asst. U.S. Atty., Peoria, Ill., Gerald D. Fines, U.S. Atty., for defendant-appellee--cross-appellant.
 Before BAUER and EASTERBROOK, Circuit Judges, and SWYGERT, Senior Circuit Judge.
 EASTERBROOK, Circuit Judge.
 
 
 1
 Eric Nemmers was born in July 1973, more than three weeks late. His mother had a difficult labor. Her physicians at a naval hospital told her to go home and stay there until she had regular pains, five minutes apart. They performed no tests and prescribed no medicine other than a suppository. When Mrs. Nemmers called to inquire about intense but irregular pains, a nurse told her to stop calling until she had regular pains. After more than two days of irregular pains, Mrs. Nemmers was taken to the naval hospital, where a physician performed a Caesarean section. Eric survived but is retarded (IQ of 45) and has cerebral palsy. The district judge concluded after a bench trial that Eric's problems were caused by negligent medical treatment at and before his birth. 612 F.Supp. 928, 933 (C.D.Ill.1985). The case presents three problems: the statute of limitations, the extent of compensation for a reduction in the ability to enjoy life, and the rate of change of the cost of Eric's care.
 
 
 2
 * The Federal Tort Claims Act allows two years within which to file a claim. 28 U.S.C. Sec. 2401(b). The time starts to run in a medical malpractice case when the plaintiff has the information necessary to discover "both his injury and its cause." United States v. Kubrick, 444 U.S. 111, 120, 100 S.Ct. 352, 358, 62 L.Ed.2d 259 (1979) (footnote omitted); Green v. United States, 765 F.2d 105, 107 (7th Cir.1985); Drazan v. United States, 762 F.2d 56, 58-59 (7th Cir.1985); Stoleson v. United States, 629 F.2d 1265, 1269-70 (7th Cir.1980). By the time Eric was 18 months old, his parents knew that he had cerebral palsy or muscular dystrophy. But they did not file a claim until October 1981, more than eight years after Eric's birth. If they discovered, or in the exercise of reasonable diligence could have discovered, the role of the naval hospital in Eric's defects before October 1979, this suit is barred by Sec. 2401(b).
 
 
 3
 Between 1973 and 1976 Eric's treating physician expressed puzzlement about the cause of his affliction, stating "these things just happen". 612 F.Supp. at 930. In May 1977 the Nemmers took Eric to a new physician, Steven Copps, who wrote a report principally designed to tell the Nemmers how to care for their son. The first page of the report contains this language:
 
 
 4
 Eric has evidence that indicates to us that he experienced some mild brain damage prior to his birth. As is often the case, we can't explain to you the exact reason for this occurrence but we do not find evidence in this particular case to suggest any genetic implications.... Such insults that occur before birth can be from any number of reasons, one of which is the possibility of the youngster contracting a viral illness in the mother's uterus prior to birth. From the [medical] history you had a relatively severe influenza-like high fever illness at about the 3rd month of your pregnancy. It is possible that this illness could have affected young Eric in the formative stages of embryological development; the fetal distress experienced during labor merely being a reflection of the pre-existent problem and not because of the trauma of delivery although that might have also contributed to his present condition somewhat. Ordinarily youngsters who have cerebral palsy on the basis of brain damage that occurs just before, at, or just after birth have different expressions at this time which Eric doesn't demonstrate. If they have had lack of oxygen to the brain substance they develop tightness or spasticity of muscles more marked in the lower than the upper extremities. If they have had bleeding into the brain substance, they usually develop spasticity or tightness of muscles on one side of the body. This is not the case in Eric's situation.
 
 
 5
 The government maintains that Dr. Copps's remark that the trauma of delivery "might have contributed somewhat" to Eric's problem would have alerted a reasonable person to the need for further investigation, particularly when coupled with the fact that Eric's mother had only a cold, and not a "severe influenza-like high fever illness", during her pregnancy. Dr. Copps did not pin the blame on the naval physicians. But if the letter had read: "There is an 80% chance that the mother's severe influenza caused the affliction, and a 20% chance that the trauma of delivery did so", and if the mother knew that she had not had influenza, then the 20% chance assumes greater significance. So, the government concludes, the time started to run in May 1977, when Mrs. Nemmers was in a position to put this letter together with her knowledge that Eric had been born three weeks late after a difficult labor and little medical attention. The Nemmers, who had some of the medical records from 1973, never asked Dr. Copps what their significance might be.
 
 
 6
 The district court concluded that the statute did not begin to run until 1981, when the Nemmers read a newspaper article about a child with a similar problem caused by poor care at the time of delivery. The court's opinion does not discuss the significance (if it has any) of the fact that in May 1977 Mrs. Nemmers knew that she had had a difficult delivery but had not had influenza during her pregnancy. Instead the district court concluded that the advice the Nemmers received before 1977 (that the cause of Eric's problems was unknowable) "effectively diverted [them] from the import of those [medical] records" (612 F.Supp. at 930) and Dr. Copps's report. The court said this about the report (id. at 931):
 
 
 7
 There was in the letter a reference to "the trauma of the birth" and "fetal distress," but again, [the Nemmers's] attention was diverted by [Dr. Copps's] asserted belief that influenza was the cause. Clearly, the Nemmers could have challenged the statements with respect to the nature of the disease, but there was no reason to have done so. Their goal was the rehabilitation of their son, not the determination of the cause or the assessment of blame. The Court does not believe that it can reasonably be said that, at the time, they knew or should have known that fetal distress or Mrs. Nemmers' difficult labor and delivery could have caused Eric's condition. The Court accepts the testimony of Eric's parents that they believed that "trauma of birth" meant that Eric "had a hard time being born," not that he had developed an injury occasioned by lack of oxygen because of delay in the baby's delivery.
 
 
 8
 The court's inquiry was subjective. When did Mr. and Mrs. Nemmers know enough to fix blame? This appears in the remark that they were not concerned with cause because they wanted to achieve rehabilitation and in the comment that they (personally) interpreted "trauma of birth" in a particular way. The court assessed the Nemmers's personal decisions, not those of the "reasonable man" of tort law. Doubt about whether the court took a subjective approach was dispelled later in the opinion (id. at 933, emphasis in original):
 
 
 9
 [T]he test for determining when the statute of limitations begins to run is focused on Plaintiffs and on that time when they reasonably knew or should have known of the existence of a cause of action.... The Court is convinced that, by the time the Nemmers received the letter from Dr. Copps, they had moved beyond the stage of seeking causes and assessing blame and were primarily concerned with effecting whatever improvements they could in Eric's condition and preparing him to live a life as close to normal as possible. Therefore, their attitude, coupled with Dr. Copps' diversion of their attention to the alleged influenza and its possible impact, as well as their understandable failure to understand the significance of the term "trauma of birth," rendered the substance of Dr. Copps' report insufficient to create the type of notice which would trigger the running of the statute of limitations.
 
 
 10
 The observation that the Nemmers had "moved beyond the stage of seeking causes and assessing blame" shows that the judge thought the question was when the Nemmers subjectively knew enough to trigger their action. To this the judge joined the remark that the time starts when they knew "of the existence of a cause of action"--meaning not only causation but also negligence. Kubrick holds, to the contrary, that the time does not depend on knowledge that the government's acts might have been negligent.
 
 
 11
 Our question, then, is whether the running of the statute of limitations depends on the plaintiffs' personal knowledge and reactions or whether it depends on the reactions of the objective, "reasonable" man. The answer is the latter, an answer reflected in the formula "knew or should have known". The first part is actual knowledge, the second is an objective inquiry. A person "should have known" enough when a reasonable man--"a reasonably diligent person (in the tort claimant's position)", Drazan, 762 F.2d at 59--would have known enough. And what the reasonable man had to know is not a certain cause--for "truth" is not within human reach, and even after trial there may be much uncertainty--but a potential cause. In Kubrick the plaintiffs claimed that an infusion of an antibiotic into a wound had caused deafness. The question whether the antibiotic caused the deafness was hotly disputed through the appeal, but this did not mean that the statute had never started to run. We observed in Drazan that the statute of limitations should not be construed to compel everyone who knows of an injury to scour his medical records just in case the government's physician did something wrong (762 F.2d at 59); that would require much useless shuffling of paper. Similarly, a "layman's subjective belief" in a cause does not start the statute when a competent medical professional would disagree with the belief. Stoleson, 629 F.2d at 1270. But when a competent physician after reflection says something like: "there is a 20% chance that the problem comes from the circumstances of birth", then it is time to get out the records and inquire further. The putative plaintiff need not know that the suspicious event is more likely than not the cause. He may need discovery to determine the most likely cause, and Kubrick emphasizes that the running of the statute of limitations does not depend on having enough information to prevail at trial. Similarly, the would-be plaintiff need not know that the injury is iatrogenic (induced by a physician). Oversight may "cause" harm even though none of the physician's acts makes a natural condition worse. Knowledge, actual or imputed, of either iatrogenic injury or oversight when attention was called for may cause the claim to accrue.
 
 
 12
 The principle that the statute starts to run when a reasonable person would know enough to prompt a deeper inquiry into a potential cause comes from the function of the statute of limitations. It is to bring cases to the legal system before memories fade and evidence disappears. (Both happened in this case. The Navy's physicians "have no independent memory of any of the critical events", 612 F.Supp. at 933, and critical records have been lost or destroyed.) The statute of limitations apportions the consequences of the flow of time. Until the victim has a reasonable opportunity to discover the cause, or a potential cause, the tortfeasor must bear the consequences. Once knowledge of the cause is available, any delay in pursuing the cause and developing a case rests with the would-be plaintiff. There is no reason why defendant must bear the consequences of a victim's decision to "move beyond blame". Kubrick said that the statute runs even if the plaintiff, because of bad advice, is dissuaded from filing suit. Once the victim knows a potential cause, "[i]f advised that he has been wronged, he may promptly bring suit. If competently advised to the contrary, he may be dissuaded, as he should be, from pressing a baseless claim. Of course, he may be incompetently advised or the medical community may be divided on the crucial issue of negligence, as the experts proved to be on the trial of this case. But however or even whether he is advised, the putative malpractice plaintiff must determine within the period of limitations whether to sue or not .... If he fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed or himself determines to bring suit". 444 U.S. at 124, 100 S.Ct. at 360. So what a plaintiff actually knows is not dispositive; the time may be running even if the plaintiff has received unequivocal medical advice that the government is not to blame or did nothing wrong.
 
 
 13
 Under a regime of notice pleading, a person may file suit and use discovery to bring out essential facts. Fed.R.Civ.P. 11, which requires investigation to precede suit, does not require investigation to the point of certainty. The longer the period of limitations, and the less demanding the requirements of pleading, the less a putative plaintiff need know to start the running of the period. The two years of private investigation plus discovery in litigation supplies the facts. A medical report stating that there is a significant chance that an event caused an injury therefore is enough to start the period, which requires the claimant to begin his investigation.
 
 
 14
 The district court asked whether the Nemmers should have acted, given their priorities (which in 1977 did not include finding a cause, that is, "fixing blame") and their misunderstanding of Dr. Copps's terminology. This is the wrong question to ask, so the answer cannot stand even though part of the answer was phrased in objective terminology ("should have known"). The court's whole opinion reveals this to be formulaic and not the basis of the decision.
 
 
 15
 Although the district court's legal approach was incorrect, it is not an appellate court's function to decide in the first instance how the case comes out under the correct legal standard. The district court in the first instance must marshall and evaluate the facts and draw the appropriate inferences. Icicle Seafoods, Inc. v. Worthington, --- U.S. ----, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986). Here inferences, which are "facts" under Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Mucha v. King, 792 F.2d 602, 604-06 (7th Cir.1986); and Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423, 1427-29 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986); are much in dispute. The pediatrician's report does not say "Either a severe influenza or a lack of oxygen at the time of birth caused Eric's affliction." It mentions the possibility of "birth trauma" (an ambiguous term that might refer to normal birth and might refer to difficult birth) but debunks events "just before, at, or just after birth" as likely causes. A reasonable person might read this report as saying that the medical care near the time of birth (whether the care was exemplary or awful) did not cause Eric's cerebral palsy. Yet a reading of this letter, in conjunction with the Nemmers's knowledge that Mrs. Nemmers did not have a severe influenza during pregnancy and was unattended and unmedicated for almost three days of intermittent labor, might signal a significant chance that medical decisions near the time of birth played a causal role. Only the district judge may resolve the question whether the report would suggest to a "reasonable person" that the medical care rendered (more accurately, not rendered) in 1973 played a role. The district court should reassess the evidence under the correct legal standard. "The government showed that the suit was untimely. It is up to the [Nemmers] to show that [they] had no reason to believe that [Eric] had been injured by an act or omission of the government." Drazan, 762 F.2d at 60. We assume that the district court can make the necessary findings without resuming the trial, but the judge possesses the discretion to take any further evidence that he believes appropriate. The resolution of the factual dispute between the parties is the district court's call, see Maine v. Taylor, --- U.S. ----, ----, 106 S.Ct. 2440, 91, L.Ed.2d 110 (1986); Pullman-Standard v. Swint, 456 U.S. 273, 287-91, 102 S.Ct. 1781, 1789-91, 72 L.Ed.2d 66 (1982), and the court should not seek in our discussion clues about how the dispute should be resolved. We mean to leave none.
 
 II
 
 16
 If the judge reaffirms his conclusion that the suit is timely, he will need to make further findings concerning the quantum of damages and the costs of Eric's future care. This was a bench trial, and Fed.R.Civ.P. 52(a) requires the court to make findings of fact and conclusions of law on all material, disputed issues. He made none on these two. (The plaintiffs request us to make the findings and awards. We are not authorized to do this. See Icicle and Anderson.[1] )
 
 
 17
 An expert witness testified that wages historically have increased about 2.2%, net of inflation, per year. The court used this figure to project the earnings Eric would have received but for his injury. The court found that the long term interest rate is 11.5% and the long term inflation rate 7.5%, for a real discount rate of 4% per year. The assumption that wages increase 2.2% after inflation led the court to apply a discount rate of 1.8% per annum to Eric's assumed initial earnings of $13,600 per year for 38 years. The methodology is appropriate.[2] O'Shea v. Riverway Towing Co., 677 F.2d 1194, 1199-1201 (7th Cir.1982); Comment, Inflation, Productivity, and the Total Offset Method of Calculating Damages for Lost Future Earnings, 49 U.Chi.L.Rev. 1003, 1014-18 (1982). But the 2.2% change in earnings vanished when the judge discounted to present value the cost of Eric's care. The court assumed that for the rest of his life Eric would need two full-time health care providers as surrogates for his parents, at $18,000 per year apiece, and a manager (in the nature of a guardian ad litem) at $10,000 a year. No one gave an expert view of the probable movement of the salaries of these three people (net of inflation), but the 2.2% estimate for wages in the economy as a whole may be the best guess. The court said: "Using the same formula as above for reducing the award to present cash value and electing not to factor in the 2.2% annual real salary growth for the surrogate personnel, the Court hereby awards Eric Nemmers funds for his future care and maintenance in the amount of $1,173,729.15." 612 F.Supp. at 935. Why not take account of the 2.2%? This makes a difference of more than $600,000.[3] Rule 52(a) requires a judge to explain decisions of this magnitude.
 
 
 18
 The Nemmers also asked the court to award damages for non-pecuniary losses under the rubric "quality of life." A reduction in the ability to appreciate one's own life, and to experience the lives of others through books, is a real loss just as surely as pain and suffering is a real loss. Eric does not suffer pain, but he will never live greatly. Maryland law (which applies to this case because the naval hospital was in Maryland) allows a finder of fact to award damages for a diminution in the ability to enjoy life. McAlister v. Carl, 233 Md. 446, 197 A.2d 140, 145 (1964). The district court said: "The Court declines to award compensation for 'quality of life' considerations." 612 F.Supp. at 935. That is the full discussion, and it is insufficient under Rule 52(a).
 
 
 19
 Again the subject is not trivial; Eric asked for more than a million dollars on this account. The government asserts that the award of "quality of life" damages is discretionary under Maryland law, but it does not cite a single Maryland case. (Neither does counsel for the plaintiffs, though he does rely on model jury instructions that in turn rely on the state's cases.) We may assume that the award is discretionary, maybe even disfavored--a reservation appropriate in light of the inadequate briefing. McAlister emphasizes the discretionary nature of the award and cautions against awards based on speculation. Cf. Jones v. Malinowski, 299 Md. 257, 473 A.2d 429, 436-37 (1984). But a judge may not exercise discretion after the fashion of a kahdi, withholding or handing out favors at whim. "[D]iscretionary choices are not left to a court's 'inclination, but to its judgment; and its judgment is to be guided by sound legal principles'." Albemarle Paper Co. v. Moody, 422 U.S. 405, 416, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975), quoting from United States v. Burr, 25 F.Cas. 30, 35 (No. 14,692d) (CC Va.1807) (Marshall, C.J.). "[D]iscretion must be judicial discretion. It must be subject to rational criteria, by which particular situations may be adjudged. ... Discretion without a criterion for its exercise is authorization of arbitrariness." Brown v. Allen, 344 U.S. 443, 496, 73 S.Ct. 397, 441, 97 L.Ed. 469 (1953) (Frankfurter, J.). The question whether Eric receives a large sum deserves more analysis than "The Court declines to award compensation for 'quality of life' considerations."
 
 
 20
 The district court hinted at a reason for its decisions not to factor in an increase in the attendants' salaries and not to award damages for a reduction in Eric's ability to enjoy life. It stated: "Through this final order, the Court intends to provide for Eric's reasonable needs without generating a windfall for his family. If the parties had been amenable to a reversionary trust, the Court would have been less conservative in estimating the base value of Eric's future needs. But Ronald and Sarah Nemmers were not Plaintiffs in their own rights nor have they demonstrated compensable injuries caused them by Defendant's negligence. The Court is not prepared, therefore, to make them an award except to the extent they are benefitted by relief from the financial burden of caring for their son in the future." 612 F.Supp. at 935. The reference to "base value" suggests that this consideration influenced the choice of the custodians' starting wage (and other expenses) rather than the method of discounting to present value or compensation for a reduction in the quality of life. It should not have influenced the base value or any other value, however, and we trust the district court will put this out of mind in making any awards on remand.
 
 
 21
 The "reversionary trust" to which the district court referred is a device that returns to the United States, rather than to Eric's heirs, any money from the award that remains at the time of his death. The district court's theory was apparently that his parents and siblings, his likely heirs, should not benefit from his misfortune. If the award of damages is computed correctly, however, there will be just enough to last for Eric's life. The court assumed that Eric would live another 59 years. If that is a correct assumption, then the award of damages should be exactly enough to purchase an annuity that will pay Eric every year the amount necessary to cover his care and replace his income. (If the court should award damages for a reduction in the quality of life, the award also would enable Eric's guardian to purchase goods that might give Eric some of the pleasure that he is denied from other sources.) At the same time, the properly computed award induces the government to take all cost-justified precautions. If Eric dies before his time, the annuity company keeps the excess; if Eric lives longer, the annuity company loses money on him.
 
 
 22
 Eric's parents or guardian must decide whether to purchase an annuity or to assume the risk that Eric will live longer than expected. If they buy an annuity, the insurer takes the risk and there is no need for a trust of any sort. If they take the risk that Eric will outlive the expectation, and he does, then the funds awarded by the court will be gone in 59 years and they must make up the difference. If Eric dies early, then his relatives do not get a "windfall", as the court thought; they get only compensation for assuming the risk of having to cover Eric's expenses if he outlives the income provided by the award. (We assume that Eric's relatives will bear these expenses rather than abandon him as a public charge. If abandonment is the likely outcome, there is more to the district judge's concern.)
 
 
 23
 If the court reduces the award to prevent the "windfall", then Eric's guardian no longer can exchange the full award for an annuity covering 59 years' expenses. Eric's family or the welfare system must make up the difference. Too, the award will be insufficient to deter like conduct by the government in the future; the United States will not bear the full social cost of its activities. The stingy award will not eliminate a windfall. It will instead penalize Eric's relatives who contribute to his care. In this case, as in any other tort case, the court should compute an award that will exactly cover the loss and permit the purchase of a lifetime annuity.[4] It should aim neither high nor low. If the court perceives that a victim's relatives will abandon Eric or dip into the award for their own purposes, it may appoint a guardian ad litem or require the purchase of an annuity. It may not, however, decrease the award otherwise appropriate.
 
 
 24
 The judgment is vacated, and the case is remanded for further proceedings consistent with this opinion. Circuit Rule 18 shall not apply on remand. The parties will bear their own costs on appeal.
 
 
 
 [1]
 Thomas v. United States, 327 F.2d 379 (7th Cir.1964) increases an award of damages on appeal. But in Thomas the district court had made findings of fact on all essential issues; here the district court has yet to make findings on the matters we discuss. Thomas also is inconsistent with more recent cases in this court, e.g., Robak v. United States, 658 F.2d 471 (7th Cir.1981), and in the Supreme Court, e.g., Icicle. Thomas cannot be regarded as authoritative unless the correction of damages on appeal can be done mechanically, such as changing the discount rate from 4% to 2% or something similar. See Taylor v. United States, 396 F.2d 837, 840 (6th Cir.1968). When the legal rule calls for an exercise of judgment, that means the district court's judgment. An appellate court neither finds facts nor exercises the factfinder's discretion concerning damages
 
 
 [2]
 The court came up with a present value of $661,813 in lost wages. This is hard to fathom, because a stream of payments of $13,600 per year for 38 years, converted to present value with a discount rate of 1.8%, is worth only $371,980.07 today. The court's assumption that Eric would not start to earn income until he is 19 years old (in 1991) required a further adjustment. If incomes increase by 2.2% per year after inflation, Eric's lost opportunity would be worth $15,497 per year (in 1985 dollars) in 1991. This income, running 38 years and discounted at a rate of 1.8 percent, is worth $423,863 (in 1985 dollars), but only in 1991. A cash sum of $334,895 invested in 1985 at the assumed true discount rate of 4% will produce $423,863 in 1991. A review of the expert's testimony suggests that he may have been double counting--increasing future income by anticipated inflation plus the 2.2%, then discounting only by the 4% real rate, instead of the 11.5% that should have been used if an inflation adjustment is made to the income. Although the derivation of the award for lost income is mysterious, we do not pursue this point as the government has not raised it. Both parties and the judge also overlooked the point that the award reduces the risk of loss Eric faces from other sources, and this reduction in the volatility of future earnings also has value that should be taken into account. Douglass v. Hustler Magazine, Inc., 769 F.2d 1128, 1143 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1489, 89 L.Ed.2d 892 (1986)
 
 
 [3]
 The court found that it will cost $50,100 per year to care for Eric during his remaining 59 years. Converting this stream of payments to present value at a discount rate of 4% (and assuming the payments are made at the beginning of the year) produces a present value of $1,128,674.32. A discount rate of 1.8% produces a present value of $1,811,825.47. The court's figure of $1.173 million is based on the 4% rate and probably includes a different assumption about the timing of payments
 
 
 [4]
 A reversionary trust might be useful when there is great uncertainty about the victim's life expectancy, as in Robak v. United States, 503 F.Supp. 982, 983 (N.D.Ill.1980), rev'd on other grounds, 658 F.2d 471, 479 (7th Cir.1981). The award may provide for the victim's maximum life while allowing for the possibility of earlier death. This makes the defendant (rather than the plaintiff's relatives or an annuity company) the residual riskbearer. We need not consider when it is appropriate to impose this risk on a defendant