**Janice Johnson GOULD, a/k/a Janice Lynn Johnson, Individually and as Next Friend of Andrew Gould, a/k/a Andrew Johnson, a Minor, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 86 C 3886.

United States District Court, N.D. Illinois, E.D.

March 16, 1988.

John O'Leary, Chicago, Ill., for plaintiffs.

Frederick Branding, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Janice Johnson Gould ("Janice") brought this medical malpractice action against the United States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (West 1965 and Supp. 1987), on her own behalf and on behalf of her minor son Andrew Gould ("Andrew"). Currently before the Court is the government's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. The government contends that plaintiffs are barred from bringing this action because they failed to present their claim to the appropriate federal agency within two years of the time it accrued. 28 U.S.C. § 2401(b) (West Supp. 1987). Because we find that plaintiffs' claim accrued within the two-year period prior to its presentation to the appropriate agency, we deny the government's motion to dismiss.

### I

Andrew was born on January 28, 1970, at Great Lakes Naval Hospital.[1] Janice was

---

1. Our resolution of the subject matter jurisdiction issue requires that we make factual findings concerning the date at which plaintiffs' claims accrued, *see, e.g., Crawford v. United States,* 796 F.2d 924, 928–29 (7th Cir.1986); *Nemmers v. United States,* 795 F.2d 628, 633 (7th Cir.1986). The plaintiffs have requested a hearing to resolve any ambiguities in the parties' submissions. The government contends that the documentary evidence already submitted is sufficient to decide this issue. We agree. Having read the documentary submissions by both

under the care of the doctors at Great Lakes Naval Hospital for prenatal care, delivery and postnatal care during her pregnancy. The evidence submitted by the parties indicated that Janice had a difficult pregnancy. One report indicated that during Andrew's prenatal and neo-natal period Janice required hospitalization for preeclampsie [sic],[2] also that Andrew's delivery was difficult and that Andrew required oxygen at the time of birth. It also stated that at four days of age a jaundiced condition in Andrew was noted and that Andrew required a special milk formula. (Gov't Ex. 2, Gould's Ex. 5). Since Andrew's birth, he has been under the care of numerous physicians. His mother frequently asked each of the physicians who treated and evaluated Andrew what the cause was of his hyperactivity, behavioral and neurological problems. On each occasion, the doctors indicated that they could not determine what the cause of his problems was.

Janice first took Andrew to Dr. Sumner Hagler in early 1971. Dr. Hagler treated Andrew from 1971 to 1975 and from 1978 through 1984. In 1974, Dr. Hagler suspected that Andrew was hyperactive and referred Andrew for neurological tests to diagnose Andrew's condition. The neurologist to whom Andrew was referred was Dr. Bruce Ketel. Dr. Ketel performed neurological tests upon Andrew but he could not determine what caused Andrew's hyperactivity. He did, however, state his impression that Andrew had Minimal Brain Dysfunction Syndrome. Janice asked Dr. Ketel what caused Andrew's problem, and he told her that it was not possible to tell the cause. Dr. Ketel treated Andrew for hyperactivity and directed the Goulds to put Andrew into a program to stimulate his learning abilities. The Goulds then enrolled Andrew in Project Predict in 1974. Andrew was seen by Dr. Hagler and regularly evaluated by the psychologists at Project Predict.

Andrew's physician from 1975 through 1978 was Dr. Myron Singer. While Andrew was under the care of Dr. Singer, Janice asked him what the cause was of Andrew's hyperactivity and behavioral problems, and he told her that it could not be determined. While Andrew was under Dr. Singer's care, he referred Andrew to Dr. Irving Rozenfeld, a neurologist, and to Lutheran General Hospital for neurological tests in 1977. Dr. Rozenfeld was also unable to tell Janice the cause of Andrew's hyperactivity or his behavioral problems.

In 1978, Janice wrote to the National Personnel Record Center and requested that her and her son's records be sent to her immediately. In her letter Janice stated: "My son is in desperate need of immediate help due to a problem since birth, or caused from a problem, and I need these records immediately." The government responded quickly and sent Janice the records on December 1, 1978. (Gov't Ex. 4). Janice states in her affidavit that when she requested Andrew's records, she did not know, and had never been told, that the events surrounding her pregnancy or Andrew's birth had caused his problems or were a possible cause of his problems. (J. Gould, ¶ 19). Janice provided the records to Dr. Keith McCloskey, a specialist in behavioral and learning disorders, in connection with his evaluation of Andrew. In 1979, Dr. McCloskey evaluated Andrew for his hyperactivity and learning disability. Dr. McCloskey made two diagnoses: (1) "Attentional Deficit Disorder with Hyperactivity" and (2) "Mixed Specific Development Disorders." His report did not mention any possible cause of these problems other than family problems. (Gould Ex. 4).

In addition to consulting physicians and neurologists from 1974 to 1984, the Goulds had Andrew evaluated by numerous psychologists and psychiatrists for his hyperactivity and behavioral problems. None of them could tell Janice what the cause or possible causes of Andrew's neurological

---

parties, we enter this memorandum opinion and order as our findings of fact. Fed.R.Civ.P. 52(a). We note, however, that these findings are limited only to the issue of accrual.

2. This apparently refers to "preeclampsia" which is the development of hypertension due to pregnancy or the influence of a recent pregnancy. *Stedman's Medical Dictionary*, 1133 (5th ed. 1982).

problems were. Janice states in her uncontradicted affidavit that none of the physicians, neurologists, psychiatrists or other health professionals who evaluated Andrew from the time of his birth through 1984 told her that Andrew had been injured by the prenatal care given to her or by the perinatal care given during labor, delivery and after delivery of Andrew by the physicians and employees of the Great Lakes Naval Hospital, although she repeatedly and frequently asked each of these individuals what the cause of Andrew's problems could be. Finally, Janice states that she only learned that the events of her pregnancy and Andrew's birth were a possible cause to Andrew's neurological problems and his behavioral problems when she received a report from clinical psychologist Gerald M. Stein of the Brook Clinic in December 1984. Dr. Stein in his psychological report on Andrew made the following observation:

> On the Neuropsychological Test Battery this patient obtained a profile most like those individuals with substantial, diffuse cerebral dysfunction or damage. He failed 100% of those tests most sensitive to pathological conditions. To the extent that localization is possible, the right posterior and left anterior portions of the cerebral hemisphere appear somewhat more effected. The condition is similar to those which are usually considered static and chronic. *It is certainly consistent with possible perinatal difficulties or infectuous illnesses—reported by Andrew's mother, though precise etiology is impossible to determine.* (Gould Ex. 3, at 2) (emphasis added).

Richard Gould, Janice's husband and Andrew's stepfather, states in his affidavit that on numerous occasions he specifically asked Dr. Myron Singer, Andrew's physician, whether he could tell him what the cause was or possible causes of Andrew's problems, and he told him that the cause could not be determined. (R. Gould, ¶ 6). He also asked Dr. McCloskey the same question and was given the same answer. He further indicates that he and Janice repeatedly and frequently asked the medical health professionals who cared for An-

drew what caused his problems, and that the first medical professional who reported that Andrew's problems might be related to the events surrounding his birth was Dr. Gerald Stein of the Brook Clinic.

## II.

■ 28 U.S.C. § 2401(b) provides that a tort claim against the United States is barred unless it is presented in writing to the appropriate federal agency within two years after such claim accrues. A claim accrues in a medical malpractice case either when the plaintiff has actual knowledge of his injury and its cause or when the plaintiff has the information necessary to discover "both his injury and its cause." *Nemmers v. United States,* 795 F.2d 628, 629 (7th Cir.1986) (citing *United States v. Kubrick,* 444 U.S. 111, 120, 100 S.Ct. 352, 358, 62 L.Ed.2d 259 (1979)); *Drazan v. United States,* 762 F.2d 56, 58–59 (7th Cir. 1985); *Jastremski v. United States,* 737 F.2d 666, 669 (7th Cir.1984); *Stoleson v. United States,* 629 F.2d 1265, 1269–70 (7th Cir.1980). Mere ignorance that the government's action which caused the injury constituted medical malpractice is insufficient to toll the statute of limitations. *Compare United States v. Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359 (plaintiff's claim accrued in 1969 when he was aware of both his injury and its probable cause, not in 1971 when a doctor told him that his injury was the result of medical malpractice), *with Stoleson v. United States,* 629 F.2d at 1270 (plaintiff's claim did not accrue in 1969 when she merely suspected the cause, but in 1971 when medical science first recognized the causal connection between her work with nitroglycerin and her angina attacks). Whether someone has sufficient information from which to discover the injury and the government's potential cause is determined on the basis of an objective, not subjective standard. *Nemmers,* 795 F.2d at 631. Accordingly, the statute begins to run when a reasonable person would know enough to prompt a deeper inquiry that would reveal a potential cause. *Id.* Thus, although Mrs. Stoleson had a suspicion in 1969 that her angina attacks

were caused by her job handling nitroglycerin for the government, because no doctor would confirm the *causal connection* until 1971, her claim did not accrue until that time. *Stoleson*, 629 F.2d at 1270.

On the other hand, the Seventh Circuit remanded the *Nemmers* case for the district court to consider whether a reasonable person would have made further inquiries after receiving a physician's report which attributed their son's condition to the mother's "severe influenza-like high fever illness" during pregnancy "when the mother only had a cold, and which stated that the trauma of their son's birth might have contributed to his present condition." *Nemmers*, 795 F.2d at 633. It is not necessary that a plaintiff could be given proof positive that the government caused the injury, the plaintiff need only know that the government's actions were a potential cause. *Nemmers*, 795 F.2d at 631. And if a plaintiff seeks out medical advice and is given incompetent or mistaken medical advice that the government is not the cause, when in fact competent advice would have revealed the truth, the statute of limitations is not tolled. *See Stoleson*, 629 F.2d at 1270 n. 5 ("the government, of course, should not be burdened by stale claims that result from incompetent or mistaken medical advice"); *Nemmers*, 795 F.2d at 632 ("if he fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the plantiff is otherwise informed or himself determines to bring suit").

Janice presented her claim to the Department of the Navy on May 30, 1985. In a December 12, 1985 letter to Janice's attorney, the government denied her claim on the basis that it was not presented within two years of the date of accrual. The government contends in this motion that Janice and Andrew's claims accrued either in February 1974 when Janice first learned of Andrew's injuries when Dr. Ketel diagnosed him as having minimal brain dysfunction syndrome or in November 1978 when Janice wrote to the National Personnel Record Center requesting her and Andrew's records because Andrew was "in desperate need of immediate help due to a problem since birth, or caused from a problem...." First, we reject outright the government's position that Dr. Ketel's sole comment in 1974 that Andrew had minimal brain dysfunction syndrome was sufficient to put a reasonable person on notice as to the injury and the *cause*. The statute of limitations only begins to accrue when a plaintiff has notice of both injury and *cause*. *Kubrick*, 444 U.S. at 120, 100 S.Ct. at 358. Dr. Ketel's statements might have given a reasonable notice of Andrew's injury; it in no way gave any hint as to the cause of that injury.

The government alternately contends that plaintiff's claims accrued in December 1978 because Janice had knowledge of the difficulties surrounding Andrew's birth; had stated in her letter to the Records Center that she needed the records "due to a problem since birth, or caused from a problem ..."; and because she received the records. The government states: "The medical records were sent to Mrs. Gould on December 1, 1978, and she had ample opportunity to have them reviewed by medical and legal professionals to determined [sic] the critical facts that [Andrew] had been hurt and who ... inflicted the injury." (Gov't Memo in Supp., at 4). Assuming because it is not so clear, that Janice's statement in her letter means that she thought the government caused Andrew's problems, we observe that her nonmedical subjective belief is inadequate to trigger the statute of limitations. *Nemmers*, 795 F.2d at 631. Thus, the statement in her letter without more does not mean the statute of limitations is triggered. This leaves us to consider whether the acquisition of the records, plus this subjective belief and her knowledge of the events surrounding Andrew's birth would trigger the statute of limitations. The government contends it would. Based on the facts in this case, we disagree. The Goulds did not just take the records and file them away as the government suggests. Instead, Janice

gave the records to Dr. Keith McCloskey who, upon review of the records, still could not tell her the cause of Andrew's problems. "Rather than finding a causal link between any alleged negligence and Andrew's problems, the most Dr. McCloskey could conclude was that the cause of Andrew's problems may have been a difficult family situation." (Govt Memo in Supp. at 7) (citing Plaintiffs' Response at 11). Nor were the Goulds less than diligent in their attempt to help Andrew and discover the cause of his problems. The government states that Janice's "dilatory actions" should not be allowed to toll the statute of limitations. However, Janice was not dilatory. We do not think that taking Andrew to five different doctors over the course of eight years was dilatory. *See, i.e., Jastremski v. United States*, 737 F.2d 666, 670 (7th Cir.1984) (physician father and child's mother exercised reasonable diligence by consulting a neurologist and orthopedic professionals in attempting to learn the cause of their son's injury which eventually was diagnosed as cerebral palsy). Additionally, there is no evidence that Dr. McCloskey was incompetent or mistaken by his failure in 1978 to find the cause of Andrew's problems after reviewing the records. Nor has the government submitted any evidence, despite spending the past year conducting discovery on this issue, that a competent doctor reviewing the records in 1978 would have determined the cause or even the probable cause of Andrew's problems. If this were a situation where all of the doctors who examined Andrew were incompetent or mistaken under acceptable medical practices in 1978 by their failure to discover the cause, or even potential cause, of Andrew's problems, then we would agree with the government. The government implicitly contends they were mistaken or incompetent, but does so without any evidence. We think instead

that the Seventh Circuit's decision in *Stoleson* is dispositive of this case. Mrs. Stoleson, suspecting her government job caused her angina attacks, went to several doctors and asked them if this was possible. She was told that there was no medical evidence of a causal condition between her contact with nitroglycerin on the job and her sickness. Finally, she found a doctor who was able to conclude that there was a causal connection between her occupational exposure to nitroglycerin and her cardiovascular problems. *Stoleson*, 629 F.2d at 1270. The Seventh Circuit held the statute of limitations only began to run from the time she was told by a medical practitioner that the government was a potential cause and not from the time she merely suspected it was the cause. *Id.* Although there has been no similar medical discovery in this case, we think the burden was on the government to show that Janice received incompetent or mistaken medical advice, and that had she received competent advice, she would have known the cause or potential cause of Andrew's injury.[3]

The government also argues that it is unreasonable for Janice to assert that she only discovered that the events of her pregnancy and her son's birth were a possible cause of his neurological problems when she received Dr. Stein's report in 1984. The government reads Dr. Stein's report and concludes a "careful reading of Dr. Stein's Psychological Report, however, does not support [Gould's] contention of a causal relationship between her labor and delivery and her son's behavioral problems." (Govt. Memo in Supp. at 6). This may be so, but whether or not Dr. Stein's report is evidence of a causal connection is not the issue. It may be an issue at trial, but it is not at this stage of the proceedings.

■ Instead, the government implicitly contends that Janice must have known of

---

**3.** Even though the burden of establishing an exception to the statute of limitations is on the plaintiff, *Drazan v. United States*, 762 F.2d 56, 60 (7th Cir.1985), plaintiffs met their burden by their testimony (by affidavit) that they took their son to these medical professionals. If there is any question as to the competency of the medical professional's advice or whether they were mistaken, we think it is the govern-

ment's burden to at least raise that factual issue. There is no indication in the record that any of the medical professionals the Goulds consulted offered either incompetent or mistaken advice. Accordingly, absent evidence to the contrary, we will presume the medical professionals with whom plaintiffs consulted all gave her correct and competent advice.

the causal connection before reading Dr. Stein's report because the report does not really say the government caused Andrew's injury. Thus, their only point must be to cast doubt on the veracity of the Goulds' affidavits which state they only became aware of the "possible cause" of Andrew's neurological problems after reading Dr. Stein's report. The government, however, offers no other evidence of how Janice learned of the causal connection if not from Dr. Stein's report. Therefore, we see no reason to doubt the Goulds' statements. Our review of the report leads us to believe that an individual reading the report could reasonably conclude that the events surrounding Janice's pregnancy were possibly the cause of Andrew's problems. The report states that Andrew's condition "is certainly consistent with possible perinatal difficulties or infectuous illnesses reported by Andrew's mother, though precise etiology is impossible to determine." (Gould Ex. 3 at 2). A reasonable person reading this could conclude that the government hospital and physicians may have been responsible for Andrew's troubles. Therefore, in the absence of any proof to the contrary, we see no reason to doubt the truth of the Goulds' statements. Accordingly, we find that plaintiffs' claims accrued when the Goulds received Dr. Stein's report because that is the first time they had any knowledge as to the government's potential cause of Andrew's neurological problems in addition to their previous knowledge of his injuries.

### Conclusion

Plaintiffs' claims accrued upon receipt of Dr. Stein's report in December 1984. Therefore, their claims, which were presented to the Naval Legal Office on May 31, 1985, were timely. Accordingly, we deny the government's motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). It is so ordered.