**William OBERLIN and Maureen Oberlin and William Oberlin as next friend to Maureen Oberlin**

v.

**UNITED STATES of America.**

**Civ. A. No. 89–1156.**

United States District Court, E.D. Pennsylvania.

Dec. 26, 1989.

James J. Neal, Drexel Hill, Pa., for plaintiffs.

James G. Sheehan, Linda L. Schafer, Asst. U.S. Attys., Philadelphia, Pa., for defendant.

## MEMORANDUM

KATZ, District Judge.

This is a medical malpractice case brought under the Federal Tort Claims Act (FTCA). The record of stipulated facts is set forth at the end of this memorandum. Plaintiff William Oberlin alleges on his own and on his daughter Maureen's behalf that Air Force physicians negligently failed to diagnose, and consequently failed to treat,

the premature rupture of the membranes (PROM) suffered by Virginia Oberlin when she was pregnant with Maureen. In turn, it is alleged, such failure resulted in Maureen's premature birth, infection, and cerebral palsy. Defendant the United States moved for summary judgment on the ground, among others, that the statute of limitations barred the suit. This court's order of December 21, 1989, denies summary judgment for the following reasons.

■■■ 1. The issue of whether the two-year statute of limitations, 28 U.S.C. § 2401(b), bars the plaintiffs' claims cannot be decided on summary judgment because there is a genuine issue of material fact as to when the claims accrued.[1] The record of stipulated facts before me is an inadequate factual basis for determining whether the plaintiffs possessed sufficient facts before 1986 as to know or have reason to know the cause of Maureen Oberlin's injury.

A plaintiff's medical malpractice claim accrues under the FTCA when the plaintiff knows both the existence and probable cause of his injury, not when he knows or should know "that the doctor who caused his injury was legally blameworthy." *United States v. Kubrick*, 444 U.S. 111, 121–122, 100 S.Ct. 352, 359, 62 L.Ed.2d 259 (1979). The United States Court of Appeals for the Third Circuit has explained *Kubrick*'s general standard for the accrual of a claim. "[T]he crucial question in determining the accrual date for statute of limitations purposes [is] whether the in-

jured party had sufficient notice of the invasion of his legal rights to require that he investigate and make a timely claim or risk its loss." *Zeleznik v. United States*, 770 F.2d 20, 23 (3d Cir.1985). Stated another way, the statute begins to run when the plaintiff possesses such facts that, "as a reasonable person, he should have known of the malpractice." *Barren by Barren v. United States*, 839 F.2d 987, 990 (3d Cir. 1988).

The parties have stipulated that since 1978, Maureen Oberlin's parents have *believed* that Maureen's prematurity, infection and cerebral palsy were all connected to the premature rupture of Virginia Oberlin's membranes. Stipulation of Facts ¶ 23. (See Appendix attached). The record also stipulates that the Oberlins were not subjectively aware until 1986 that the conduct of the Air Force doctors could have caused Maureen's injury. Stipulation of Facts ¶ 33—¶ 35. It is unclear from the record, however, when plaintiffs had enough facts that would put a reasonable person on notice that Virginia Oberlin's medical treatment was a potential cause of Maureen's injury.

The plaintiffs contend that the Air Force physicians' failure to diagnose PROM and consequent failure to prescribe strict bedrest for Virginia Oberlin caused the loss of a chance that Maureen would not suffer injury. The plaintiffs did know of the existence of the PROM as early as 1976. Stipulation of Facts ¶ 13, ¶ 14. Yet, there

---

**1.** It is not necessary to decide the tolling issue at present, but it may become important at a later stage. There is a split of authority as to whether William Oberlin's independent claims are preserved under the tolling rule of the Soldiers' and Sailors' Civil Relief Act (SSCRA). The United States Court of Appeals for the Fifth Circuit holds the view that § 205 of the SSCRA does not apply to servicepeople who have not been handicapped by their military service from pursuing any claims prior to the running of the limitations period. *Pannell v. Continental Can Co., Inc.*, 554 F.2d 216, 225 (5th Cir.1977). This view departs from the plain meaning of § 525.

In contrast, most other courts would apply the SSCRA to career servicemen like William Oberlin, whether or not their ability to prosecute an action is impaired by their military service. *Ricard v. Birch*, 529 F.2d 214 (4th Cir. 1975); *accord Bickford v. United States*, 656

F.2d 636 (Ct.Cl.1981); *Mason v. Texaco*, 862 F.2d 242 (10th Cir.1988); *see also Wolf v. Commissioner*, 264 F.2d 82, 87–88 (3d Cir.1959) (tolling provision of SSCRA is "mandatory;" no facts given as to whether military service was actual handicap). Certainly, the plain language of the SSCRA supports this position. I will follow that view. Congress' phrasing of another section of the SSCRA is consistent with the view that § 525 applies to all servicepeople, regardless of their actual opportunity to bring or defend claims. In § 201 of the SSCRA, Congress provides servicepeople with a stay of proceedings on the explicit condition that their military service affects their ability to prosecute or defend an action. In significant contrast, § 525 lacks such a condition, giving rise to the inference that Congress intended the section to apply to all servicepeople. *See Ricard, supra* at 217.

are not enough facts in the record to indicate whether they should have known that any conduct on the part of the doctors was the cause of Maureen's injury before they became objectively aware of this possibility. In contrast, cases which hold that the statute of limitations starts running upon knowledge of the injury and its cause involve plaintiffs who knew or reasonably should have known not only of the existence of the conduct constituting cause, but that such conduct was indeed the likely cause. For example, in *Zeleznik* the plaintiffs knew of the murder of their son, and that the murder in fact caused his death. In *Barren by Barren*, the plaintiffs had reason to know that the medical treatment given the plaintiff mental patient was unsatisfactory and that this inadequate treatment had caused his deterioration. In *Kubrick* itself, the plaintiff knew of the treatment that turned out to be the cause (neomycin therapy) of his injury (deafness) in 1968, yet the Court found that his claim did not accrue until the plaintiff had reason to know, in 1969, that the neomycin probably caused the injury.

An instructive case about the level of awareness required to start the statute of limitations running under the FTCA is *Harrison v. United States*, 708 F.2d 1023 (5th Cir.1983). The court explains that a plaintiff has "knowledge" of a fact when the fact is true, the plaintiff believes it to be true, and the belief is reasonably based. *Harrison*, 708 F.2d at 1027. "Belief," on the other hand, requires only that the fact is true and the plaintiff believes it to be true. *Id.*

The plaintiff in *Harrison* suffered severe pain, speech impairment, memory loss and burning sensations in the years following a medical test, which had been performed to determine the cause of her headaches. The many experts she consulted could not relate her medical test to her pain. Eventually she came to believe that the cause of her injury was conduct by the medical professionals during the test. Her "privately conceived notions" that this caused her injury rose to the level of knowledge and triggered the statute only when she obtained her medical records alerting her that a needle had been left in her brain during the medical test and providing a reasonable basis for her belief.

■■■ Whether the Oberlins had a reasonable basis to believe that PROM, and the failure of the Air Force doctors to diagnose and treat PROM, caused Maureen's injury, before they were made subjectively aware of this possibility, is not apparent from the stipulated factual record. In a case such as this where the malpractice theory rests on an allegation of failure to diagnose a pre-existing condition like PROM and the condition results in the development of a more serious medical problem, it can be particularly difficult for a plaintiff to identify the cause of the injury. *Augustine v. United States*, 704 F.2d 1074, 1078 (9th Cir.1983). The statute of limitations begins to run when the tort claimant has reason to know that an act or omission by the government medical personnel had been the cause of the injury. *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir.1985) (plaintiff wife knew that husband died of lung cancer, but the statute of limitations would not begin to run until wife had reason to know that government doctors also failed to follow up on husband's x-ray and such omission could have contributed to his death.) More facts are needed before the court can conclude when a reasonable person in the Oberlins' shoes would have "know[n] enough to prompt a deeper inquiry into a potential cause." *Nemmers v. United States*, 795 F.2d 628, 632 (7th Cir.1986).

The fact that the plaintiffs were consistently told by physicians that the actual cause of Maureen's injury was unknown (Supplemental Stipulated Facts ¶ 7) would not by itself delay the running of the statute of limitations, however. If the plaintiffs did have reason to know that PROM and the Air Force doctors' failure to diagnose and treat it probably caused the injury, the statute would begin to run and the plaintiffs would be under a duty to inquire about possible malpractice. That the physicians' advice might turn out to be incompetent or mistaken is no basis for delaying

the running of the statute. *Kubrick,* 444 U.S. at 124, 100 S.Ct. at 360.

In short, the court is not in a position to resolve the metaphysical differences between belief and knowledge of the cause of the alleged injury on this paper record.

■ 2. William Oberlin may also state a claim for emotional distress.[2] Most Louisiana Courts of Appeals in recent years have declined to follow the rule in *Black v. Carrollton R.R. Co.,* 10 La.Ann. 33 (1855) which prohibited recovery for mental anguish suffered because of physical injury to a third person which did not result in death. *Skorlich v. East Jefferson General Hospital,* 478 So.2d 916 (La.Ct.App. 5th Cir.1985); *Bishop v. Callais,* 533 So.2d 121 (La.Ct.App. 4th Cir.1988); *LeJeune v. Rayne Branch Hospital,* 539 So.2d 849 (La.Ct.App. 3d Cir.1989), *cert. granted,* 541 So.2d 861 (La.1989). These recent cases have allowed family members to recover for mental anguish resulting from negligently inflicted harm, short of death, to an immediate family member under a "duty-risk" analysis. *LeJeune,* in particular, points out a compelling policy reason to discard *Black:* Under *Black,* mental distress damages are unrecoverable by the parent of an injured child, yet remain recoverable by a plaintiff anguished over harm to his or her property. While I recognize that the Louisiana Supreme Court has not overruled the *Black* case as of this writing, the trend of Louisiana law is to allow recovery in situations where, as here, a parent suffers emotional distress caused by negligent injury to his child, and I agree that this is the sensible view.

■ 3. There is also a genuine issue of material fact on the issue of whether the Louisiana loss of chance doctrine forecloses the possibility that plaintiffs could prevail at trial if the loss of a 10% chance of avoiding injury was found. Under Louisiana law, the loss of a two percent chance of

survival has been held to present a question of causation for the jury. *Hastings v. Baton Rouge General Hospital,* 498 So.2d 713 (La.1986).

## APPENDIX

### STIPULATED FACTS

1. On 11/30/76 Virginia Oberlin presented at Langley Air Force Base Hospital in Langley, Va. (Exhibit 4, pp. 1, 2).

2. She was pregnant at that time, in approximately the 28th—29th week of gestation. (Exhibit 4, pp. 1, 2).

3. Mrs. Oberlin gave a history of two episodes of bleeding and four episodes of gushes of fluid within the previous week. (Exhibit 4, pp. 1, 2). She had been seen on an outpatient basis three times within the previous week.

4. Mrs. Oberlin was seen at Langley by Robert E. Rinaldi, M.D. (Exhibit 4, pp. 1, 6).

5. Dr. Rinaldi's initial diagnostic impression was of an intrauterine pregnancy of about 28–29 weeks duration, and a question of premature rupture of membranes (PROM) with a "high" leak. (Exhibit 4, p. 5).

6. Dr. Rinaldi ordered Mrs. Oberlin to be admitted to the obstetrics ward, to be kept on bed rest with bathroom privileges (BRP) only (Exhibit 4, pp. 9, 15). Diagnostic tests administered failed to confirm PROM.

7. On 12/3/76 Dr. Rinaldi did a pelvic examination and determined Mrs. Oberlin's cervix was closed. (Exhibit 4, pp. 8, 12).

8. Mrs. Oberlin contends that Dr. Rinaldi told her that she did not have P.R.O.M.

9. On 12/4/76 Mrs. Oberlin stated that she wanted to go home. (Exhibit 4, p. 13). Mrs. Oberlin's home was in Alexandria, Louisiana. (Exhibit 4, p. 9).

10. On 12/4/76 Dr. Rinaldi discharged Mrs. Oberlin. The discharge note indicates

---

**2.** Plaintiffs do not contest defendant's contention that William Oberlin may not recover for loss of consortium under Louisiana law. *Ferguson v. Burkett,* 454 So.2d 413 (La.App. 3d Cir. 1984).

The government concedes that William Oberlin has a right to maintain his own claim for the child's unreimbursed medical and special expenses during her minority even if the child's claim is time-barred if he is protected by the Soldiers' and Sailors' Civil Relief Act.

that Mrs. Oberlin was to "continue on bed rest." Dr. Rinaldi wrote a note for Dr. Vincent, Mrs. Oberlin's obstetrician back in Alexandria, Louisiana. (Exhibit 4, pp. 1, 8).

11. The final diagnosis was "questionable premature rupture of membranes (high leakage: unproven)." (Exhibit 4, p. 1).

12. On 12/5/76 Mrs. Oberlin left Langley, Virginia and flew home to Alexandria, Louisiana.

13. On 12/7/76 Mrs. Oberlin saw her attending obstetrician, Dr. Vincent. Dr. Vincent examined Mrs. Oberlin, diagnosed leaking membranes and referred Mrs. Oberlin to the Ochsner Clinic in New Orleans, Louisiana that same day. (Exhibit 5, p. 1 and Exhibit 6, p. 1).

14. Mrs. Oberlin was admitted to the Ochsner Clinic on 12/7/76, under the care of Dr. William Geary. Mrs. Oberlin was diagnosed as having premature rupture of the membrane (PROM). (Exhibit 6, p. 1).

15. At the time of admission to the Ochsner Clinic, Mrs. Oberlin was afebrlle, with a normal white count (i.e. in the range of 14,000). She was to be kept on bed rest. (Exhibit 6, p. 1).

16. On 1/7/77 Mrs. Oberlin spiked a fever and her white count rose to 17,000, indicating an infection. She went into premature labor. Vaginal examination revealed an unfavorable cervix, and her treating physicians elected to deliver by C-section. (Exhibit 6, p. 1).

17. Minor-plaintiff Maureen Oberlin was born prematurely (34 weeks gestation) on 1/7/77. (Exhibit 6, p. 1).

18. Minor-plaintiff Maureen Oberlin was diagnosed as having an infection in the first week of life, which was treated by antibiotics and resolved. (Exhibit 6, p. 1).

19. On 1/29/77 minor-plaintiff Maureen Oberlin was discharged from the Ochsner Clinic at 3 weeks of age, with a prognosis of excellent. (Exhibit 6, p. 2).

20. At around age six months, minor-plaintiff Maureen Oberlin began to exhibit signs of developmental delay. (Exhibit 7).

21. On 11/4/77 minor-plaintiff Maureen Oberlin underwent a neurological evaluation by Carmela L. Tardo, M.D. Dr. Tardo diagnosed mild cerebral palsy. (Exhibit 7).

22. Virginia Oberlin has believed, since 1976, that a vaginal examination at Langley Air Force Base Hospital resulted in premature rupture of her membranes.

23. Maureen Oberlin's parents have believed, since 1978, that Maureen's prematurity, infection and Cerebral Palsy were all connected to the premature rupture of Virginia Oberlin's membranes.

24. The Oberlins did not seek legal advice concerning their belief that vaginal examination(s) at Langley Air Force Base Hospital caused premature rupture of membranes because they believed that the vaginal examinations at Langley were necessary.

25. In 1985, Virginia Oberlin came to believe that the vaginal examinations at Langley Air Force Base were contraindicated because she learned that digital vaginal examinations should not be given to women with third trimester bleeding. As a result of this impression, the Oberlins contacted an attorney in 1986.

26. On 6/16/86 plaintiff William Oberlin filed an administrative claim with the U.S. Air Force alleging that the digital examinations performed by Dr. Rinaldi on Virginia Oberlin at Langley had "resulted in the rupture of membranes" and that "despite the rupture, Mrs. Oberlin was discharged to travel to Louisiana." The claim further alleges that Maureen's "cerebral palsy was caused by the prematurity, infection and other circumstances directly related to the premature rupture of the membranes." (Exhibit 1).

27. Following discussions with a number of obstetricians, the Oberlin's attorney concluded that the opinion within the medical community was unanimous that the vaginal examinations at Langley Air Force Base had not caused the premature rupture of Mrs. Oberlin's membranes, and that the temporal relationship between the examinations and the rupture was coincidental.

28. On 2/17/87 plaintiff's administrative claim was denied. (Exhibit 2).

29. On 7/21/87 the Oberlin's attorney asked for reconsideration of their administrative claim, alleging a new theory of liability in that physicians at Clark Air Force Base and England Air Force Base had been negligent in 1972 and 1974 respectively in failing to diagnose and to correct a "uterine septum" which allegedly predisposed Mrs. Oberlin to PROM. (Exhibit 2).

30. Plaintiffs' request for reconsideration of their claim alleging a new theory of liability was accepted. After investigation, the United States denied this resubmitted claim on 8/1/88.

31. On 2/14/89, plaintiffs filed the within Complaint, alleging that Dr. Rinaldi's failure to diagnose P.R.O.M. when Mrs. Oberlin first presented at Langley, and subsequent discharge to travel to Louisiana, deprived Mrs. Oberlin of a chance that her membranes would reseal.

32. During discussions with obstetricians, plaintiff's attorney was informed that the failure of Langley Air Force Base physicians to place Mrs. Oberlin on total bedrest, and their discharge of Mrs. Oberlin to return to Louisiana from Virginia, reduced the likelihood that Mrs. Oberlin's membranes would reseal, thus increasing the likelihood of premature birth/infection/Cerebral Palsy in Maureen Oberlin.

33. Until Mrs. Oberlin was informed, by her attorney, in 1986/1987 that failure of Langley physicians to place her on total bedrest may have prevented a resealing of her membranes, she had no suspicion that this failure may have been causally related to Maureen's Cerebral Palsy.

34. Until 1986/1987, Mrs. Oberlin was not aware that ruptured membranes could reseal, and thereby avoid prematurity, infection and Cerebral Palsy.

35. Because Mrs. Oberlin was not aware that ruptured membranes could reseal until 1986/1987, she was not aware of the causal connection between the defendant's physician's failure to place her on total bedrest and the injury to her daughter until 1987.

36. While it is possible for ruptured membranes to reseal with total bedrest, it is not probable that ruptured membranes will reseal with total bedrest.

37. The plaintiffs can produce expert testimony that:

a. Premature rupture of the membranes (P.R.O.M.) is defined as rupture of membranes prior to the onset of uterine contractions. The two major risks of PROM are infection and premature labor.

b. Physicians at Langley Air Force Base Hospital departed from appropriate standards concerning steps that should have been taken to determine whether Mrs. Oberlin's membranes had prematurely ruptured.

c. If physicians at Langley Air Force Base Hospital had acted appropriately, a diagnosis of premature rupture of membranes would have been made.

d. Once a diagnosis of premature rupture of membranes, at 28 weeks, is made, appropriate care requires total bedrest, to maximize the possibility that the membranes will reseal.

e. There is, approximately a 10 percent chance that premature ruptured membranes will reseal with total bedrest.

f. By failing to diagnose premature rupture and, thereby failing to ensure total bedrest, the physicians at Langley Air Force Base Hospital deprived Mrs. Oberlin of a chance that her ruptured membranes would reseal, thereby avoiding prematurity/infection and Cerebral Palsy in Maureen Oberlin.

g. That physicians at Langley Air Force Base should have performed an ultrasound examination, that an ultrasound would have shown a low lying placenta and that bedrest would then have been appropriate.

h. Although in most cases, including Maureen's, the cause of Cerebral

Palsy cannot be determined to a 100% percent degree of certainty, both prematurity and sepsis significantly increase the risk of Cerebral Palsy; and prematurity, together with sepsis, is the single most likely cause of Maureen's Cerebral Palsy.

38. The plaintiffs' cause of action rests on the premise that the defendant's physicians' failure to place Mrs. Oberlin on total bedrest and allowing her to travel from Langley, VA to Alexandria, LA decreased the chances of avoiding brain injury in Maureen Oberlin.

39. The law of Louisiana controls the burden of proof on causation.

40. Plaintiff's concede that if the law of Louisiana will not permit a cause of action based upon a loss of approximately a 10% chance of avoiding injury, then plaintiffs cannot prevail.

41. Federal law applies on the issue of the Statute of Limitations.

42. At all times relevant to plaintiffs' cause of action William Oberlin was a career officer in the U.S. Air Force and was continuously stationed in the United States. (Exhibit 3).

## SUPPLEMENTAL STIPULATED FACTS

1. Virginia Oberlin was seen three times at Langley Air Force Base Hospital, on an outpatient basis, during the week prior to her November 30, 1976 admission as an inpatient.

2. Virginia Oberlin contends that during the first outpatient visit, she complained of vaginal bleeding, and that Doctor Rinaldi, (Major, U.S.A.F.) performed a vaginal examination and sent her home.

Virginia Oberlin contends that later in the day she felt leakage of fluid, which she thought was rupture of membranes. (See also Exhibit 4 of Defendant's Brief at p. 2)

3. Virginia Oberlin contends that, following the sensation of leaking fluid, she returned to Langley Air Force Base Hospital, was vaginally examined by a physician, and was again sent home. (See also Exhibit 4 of Defendant's Brief at p. 2)

4. Virginia Oberlin contends that she continued to leak fluid following the second outpatient visit to Langley Air Force Base Hospital, and therefore returned to the hospital a third time where she was again vaginally examined by Doctor Rinaldi, then sent home. (See also Exhibit 4 of Defendant's Brief at p. 2)

5. Virginia Oberlin was hospitalized on November 30, 1976, following the three prior outpatient visits.

6. The Oberlins contend that until 1986, they were under the impression that bedrest was appropriate for PROM in order to reduce the risk of premature labor.

7. Although the Oberlins believed that PROM, prematurity, and sepsis contributed to Maureen's cerebral palsy, the Oberlins contend that they were never informed by any physician that such was the case. The Oberlins contend that they were consistently told that the cause of Maureen's cerebral palsy was unknown.