Sibyl HARRISON, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 81–2501.

United States Court of Appeals, Fifth Circuit.

July 5, 1983.

Rehearing Denied Sept. 26, 1983.

---

Leslie R. Echols, Paris, Tex., for plaintiff-appellant.

William J. Cornelius, Jr., Janet Hellmich, Asst. U.S. Attys., Tyler, Tex., for defendant-appellee.

Before INGRAHAM, REAVLEY and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Sibyl Harrison's headaches began in 1962. They continue to this day—the pain amplified by the dismissal of her suit under the Federal Tort Claims Act as barred by the statute of limitations.

As the wife of a retired airman, Harrison sought medical treatment in December 1966 at Wilford Hall Hospital, Lackland Air Force Base, San Antonio. Doctors Benjamin Allen and Richard Ashby, Air Force medical officers, suspecting a brain tumor, decided to perform a ventriculogram and pneumoencephalogram. These very painful procedures involve the introduction of air into the brain and spinal cord, respectively, as a part of x-ray examination of the brain.

During the examination Harrison was placed in a special chair which could be positioned to permit the doctors to control the movement of the air bubble. Typically, the back of the chair is dropped, the patient is placed first in a supine position and is then rotated upside down. When the x-rays from the ventriculogram proved inconclusive, the doctors injected an air bubble into Harrison's spine. The needle used in the ventriculogram was left in Harrison's skull during the subsequent procedure.

During the course of the tests and while the chair was being moved, Harrison lost consciousness. Upon reviving, she noted a slight numbness in her arm, a condition the doctors described as a normal reaction to the tests. Other patients informed Harrison that they, too, had experienced transient numbness. As anticipated, Harrison's numbness soon disappeared.

In the ensuing years Harrison suffered from the left frontal headaches which had first caused her to seek help at Wilford Hall. In addition, she experienced speech impairment, loss of memory and a burning sensation on the left side of her face. She

consulted several doctors; none could help. By 1968 she was under the care of Dr. Thomas Nash, a private physician. He could not identify the cause of Harrison's difficulties and referred her to St. Paul Hospital for extensive testing. In a letter to a colleague, Nash wrote: "I cannot make a definitive diagnosis .... It certainly is one of the most bizarre and unusual cases I have seen."

The tests conducted at St. Paul Hospital indicated a possible answer to the mystery—Harrison had an acoustic brain tumor. In June 1968, Dr. Charles Simpson surgically removed a portion of the tumor. The location of the tumor prevented complete excision, and the possibility of regrowth remained.

The abatement of Harrison's pain was short-lived. The headaches, numbness, paralysis and burning sensation returned and were increasingly painful. Her life began to disintegrate. Constant pain forced closure of her small flower shop and interfered with her efforts to care for her invalid husband. Desperate to find an explanation for her suffering, Harrison became convinced that the tumor was growing anew. She returned to Simpson every other month for two years, insisting on x-rays of the tumor. No new growth was found. Though unable to identify the source of Harrison's pain, Simpson assured her that it was not the tumor. He refused to conduct further x-ray examinations, telling her "I'm going to burn your brain up." On the basis of what he then knew of Harrison's medical condition and history, including information received from Allen and Ashby, Simpson concluded that Harrison would never recover. He finally told her "You've bought the farm. It's yours. You're going to have it from now on."

During this period, in her desperation, Harrison grasped at a new theory for her pain—the doctors at Wilford Hall had damaged her brain. Just as she had earlier believed that the tumor was growing wildly in her head, she now came to the view that Wilford Hall was the source of her difficulty. She took this suspicion to Simpson who rejected it. Harrison sought legal counsel.

Harrison told her attorney, Leslie Echols, that she believed the doctors at Wilford Hall were responsible for her difficulties. Pressed for supporting data, Harrison could only share her speculation. Echols found no medical evidence and no rational basis for Harrison's intuitive conclusion. Indeed the evidence then available—the written opinions of the legion of doctors Harrison had consulted, suggested that the care at Wilford Hall had been the best possible. Echols declined to proceed further.

Harrison was undaunted. She tried to obtain copies of her medical records from Wilford Hall. When she ran into a stone wall, she again sought Echols' assistance. He reluctantly agreed to make another effort. In December 1973 Echols traveled to Dallas in the hope that Dr. Simpson would shed some light. When Simpson told senior attorney Echols' "Son. You're doing nothing but chasing rabbits," Echols redoubled his efforts. He paid a personal visit to Wilford Hall. The Clinical Records Librarian informed Echols that she could not then locate the records but that she would check further and contact him. She did not do so. Echols' repeated attempts to communicate with the records librarian were signally unsuccessful.

In the meantime, Simpson referred Harrison to Duke University Hospital, for help in determining the cause of her pain. The experts there were unable to define the cause of the pain, ruled out brain surgery as too risky, and expressed the opinion that the condition was permanent. Once again, Harrison was stymied. The best medical advice she could secure was of no assistance in pinpointing the cause of her difficulty.

By the end of 1974, at Simpson's suggestion, Harrison visited a psychiatrist. Simpson was of the opinion that Harrison had become addicted to the medication given for palliation of the pain and thought she might benefit from psychiatric assistance. In discussing the history of her illness with the psychiatrist, Harrison focused on a new theory: when he removed the excisable portion of the tumor, Dr. Simpson had sliced

through her brain causing all of her ailments. As with the prior theories, available medical evidence did not support Harrison's belief.

After his efforts at Wilford Hall produced nothing, not even response to his inquiries, Echols reported to Harrison and commented that she might have better luck writing to the President of the United States. Harrison wrote.

The President responded. Harrison received a letter from a Colonel, who wrote on behalf of the President to advise that her letter had been placed "in the hands of appropriate officials for their careful consideration." Harrison heard further, by letter dated July 26, 1975, from Colonel L.E. Seminare, Jr. The letter stated:

> Authorities in the Office of the Surgeon General, USAF, reviewed your inpatient records from Wilford Hall and found no evidence of mismanagement in your case .... [Y]our records show no evidence of any difficulties being encountered during the procedure.

Echols was puzzled. From the information he had been furnished, the records were not in Washington, D.C. The letter, however, suggested they were. Echols headed for Washington. He went to the Pentagon and spoke to a Lieutenant who told him the records were across town at the Forrestal Building. A Lt. Colonel at the Forrestal Building advised Echols that the records were at nearby Andrews Air Force Base. A Captain at Andrews referred Echols to nearby Bolling Air Force Base. A Captain there told Echols his client's records were in St. Louis. Echols returned to Paris, Texas.

In February 1976, Echols received an unexpected telephone call from a Colonel at Lackland advising that the files had been found and were being mailed immediately. Weeks passed. Echols telephoned the Colonel who stated that the records had inexplicably disappeared but vowed to track them down. Months passed.

On July 23, 1976 the records finally arrived. Echols took them to Simpson. In less than a minute the decade-old mystery of Sibyl Harrison's enigmatic difficulties was solved: During the course of the tests at Wilford Hall the needle from the ventriculogram had plunged into the center of Sibyl Harrison's brain. Before beginning the spinal puncture Ashby and Allen had neglected to remove or secure the needle, or replace it with a safer, more flexible needle. While Harrison was being turned about, the needle was driven into her thalamus. Simpson perceived Allen's contemporaneous medical notes as "clear-cut evidence that [Harrison's] thalamic pain is due to the ventricular needle having been placed in the thalamus from whence developed a thalamic scar which is the cause of pain."

It is appropriate to inquire why the source of Harrison's problems eluded so many doctors. That inquiry is relevant to the issue before us today. First, the thalamus is located toward the center of the brain, away from the area in which air would be introduced during a ventriculogram. It would be an extremely unusual occurrence to pierce the thalamus during that procedure.

Second, Simpson and all of the other doctors were told by Allen and Ashby that the tests were properly performed. Before removing Harrison's tumor in 1968 Simpson wrote Allen and Ashby, requesting the x-rays and a full account of the tests performed at Wilford Hall. Ashby and Allen did not release the x-rays; instead they assured Simpson that "the only abnormality we ever found [was that] the right cerebellar pontine angle failed to fill." That abnormality was totally unrelated to the thalamic injury. To suggest that the representation by Ashby and Allen was merely less than candid would be unjustifiably kind. The x-rays clearly revealed that the needle had penetrated the thalamus. Further, immediately after receiving the x-rays Allen and Ashby discussed the damage that had been caused to the thalamus. Finally, the "work-up," which Ashby purported to be a complete summary of the tests, made no mention of the thalamic insult, despite the fact that notes taken by Allen at the time of the ventriculogram revealed the true na-

ture of the damage: "x-rays demonstrated that tip of ventricular needle is penetrating floor of . . . thalamus."

Third, Harrison was unable to provide any persuasive information that might have given a clue as to what had happened at Wilford Hall. She was not conversant with the procedure. She told of her beliefs but she could only report that the chair dropped backwards, a normal movement since the chair was designed to first lay the patient supine and then tilt the patient upside down as a means of directing the movement of the air bubble.

Fourth, Harrison's headaches predated the Wilford Hall incident and were compounded after Wilford Hall by other complications including an acoustic brain tumor, brain surgery, drug addiction, exposure to large amounts of x-rays, and a variety of emotional problems.

Fifth, the only direct evidence of a thalamic injury was contained in the x-rays done at Wilford Hall. Without those x-rays, or accurate reports based on that x-ray evidence, the doctors could do no more than speculate as to the possible source and cause of Harrison's problems. These critical x-rays were purposely suppressed for nearly a decade. They were not overlooked—they were hidden from view.

### The Law

■ The Federal Tort Claims Act prescribes a two year statute of limitations. 28 U.S.C. § 2401(b). The period does not begin to accrue until the plaintiff has "knowledge of the 'factual predicate for a malpractice claim,' i.e., 'the fact of his injury [and] its cause.'" *Lavellee v. Listi,* 611 F.2d 1129, 1131 (5th Cir.1980) (*quoting United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979)). As stated by our colleagues in the Seventh Circuit: "In medical malpractice cases . . . the statute of limitations does not begin to run until after the patient discovers or in the exercise of reasonable diligence should discover his injury and its cause." *Stoleson v. United States,* 629 F.2d 1265, 1268 (7th Cir. 1980). The plaintiff need not have knowl-

edge of fault in the legal sense for the statute to begin to run, but she must have knowledge of facts that would lead a reasonable person (a) to conclude that there was a causal connection between the treatment and injury or (b) to seek professional advice, and then, with that advice, to conclude that there was a causal connection between the treatment and injury. The district court held that Sibyl Harrison was aware of the facts of her injury and their cause sometime before September 20, 1974. Since she did not file suit until September 20, 1976, her claim was considered barred.

■ In assessing the awareness required to trigger the statute of limitations, it is essential to distinguish between "knowledge" and "belief." For one to have knowledge of fact "x," three requisites must exist: (1) "x" must be true, (2) the person must believe "x" to be true, and (3) the belief must be reasonably based. A. Flew, *A Dictionary of Philosophy* (1979); A. Quinton, "Knowledge and Belief," *Encyclopedia of Philosophy* (1967). "Belief," which is a component of knowledge, requires only requisites (1) and (2)—"x" must be true and the person must believe it to be true. As a consequence, conclusions based on dreams, intuitions, suspicion, conjecture, ESP, speculation, or faulty reasoning, even if true, are merely "belief." Absent a reasonable basis, these conclusions do not rise to the level of "knowledge."

The distinction between knowledge and mere belief has long been recognized by the courts, implicitly if not explicitly. In *Tracerlab, Inc. v. Industrial Nucleonics,* 313 F.2d 97, 102 (1st Cir.1963), the court observed:

> The 'personal knowledge' in Sanborn v. Gale [162 Mass. 412, 38 N.E.2d 710 (1894)] must be compared with the present case where the [plaintiff] . . . did not know any facts and had only 'rumor,' 'suspicion,' 'guesses,' and 'surmises.' . . . Suspicion and knowledge are poles apart on a continuum of understanding.

■ Prior to July 1976, Harrison had only a belief. She could not know the basis

for her injury. The myriad medical and legal experts could not express a reasoned opinion that the cause of her impairment was an error in the medical procedures conducted at Wilford Hall. They could not relate causally her difficulties and Wilford Hall. It is not reasonable to suggest that before gaining access to her records Harrison possessed the requisite knowledge of the cause of her condition when doctors who knew immeasurably more than her were stymied and freely admitted their bewilderment. It would be unreasonable to hold Harrison to a higher degree of medical competence and understanding than the many medical experts she consulted.

Harrison's suspicion or belief that her problems dated from Wilford Hall was merely one of a series of explanations that she seized upon in anguish and desperation to explain her illness. Her privately conceived notions did not become knowledge until July 1976 when she received copies of her medical records. Only then was she in a position to know that her difficulties were caused by a slip in the procedures at Wilford Hall. *See Aerojet-General Shipyards, Inc. v. O'Keeffe*, 413 F.2d 793 (5th Cir.1969).

The situation Harrison faced is exactly the type of situation referred to by Justice White in *United States v. Kubrick*, when he observed that "the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." 444 U.S. at 122, 100 S.Ct. at 359. In such an instance, other conditions being met, the statute of limitations is tolled.[1]

REVERSED AND REMANDED.

1. Because of our disposition of this appeal we need not resolve the issue of fraudulent concealment which is inherent in the factual situation presented herein. We merely note that limitations is an affirmative defense with the defendant generally bearing only a modest burden of proof. Typically, one merely views the date suit is filed in light of the date of the occurrence. But that simple situation does not apply when equitable considerations are urged as an offset to the limitations bar. *Prather v. Neva Paperbacks, Inc.*, 446 F.2d 338 (5th Cir. 1971). When, as here, the plaintiff shows that a defendant has actively worked to conceal information about plaintiff's injury or its cause, the defendant bears a heavier burden in show-

ing that the plaintiff possessed the level of knowledge required to commence accrual of the period of limitations. *Compare, Barrett v. United States*, 689 F.2d 324 (2d Cir.1982); *Fitzgerald v. Seamans*, 553 F.2d 220 (D.C.Cir.1977). In addition to the active concealment by Allen and Ashby, there is the additional dimension of concealment following from their failure to advise Harrison of the injury. Silence may constitute fraudulent concealment in the instance of a fiduciary relationship such as that which exists between doctor and patient. *Nardone v. Reynolds*, 538 F.2d 1131 (5th Cir.1976); *Peck v. United States*, 470 F.Supp. 1003 (S.D.N.Y. 1979).